IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | 2:06-CR-0061 (01) |
| | § | |
| DALE ANDREW BESSOLO | § | |

**REPORT AND RECOMMENDATION
TO DENY DEFENDANT'S MOTION TO SUPPRESS**

Came for consideration the motion to suppress filed September 27, 2006, by defendant DALE ANDREW BESSOLO. On October 19, 2006, an evidentiary hearing on the motion was held. Upon consideration of the evidence presented at the hearing, the pleadings, and controlling case law, the undersigned United States Magistrate Judge is of the opinion defendant's motion to suppress should be DENIED.

I.
FACTUAL BACKGROUND

On August 12, 2006, at approximately 11:27 a.m.,[1] Texas Department of Public Safety Trooper Juan Medrano was traveling eastbound on US Highway 60 on routine patrol when he clocked a westbound U-Haul truck traveling 76 mph in a 70 mph zone. At a hearing on the instant motion, the trooper testified that as he passed by the truck on the highway, the driver looked over at him and quickly looked back to the front, appearing startled. The trooper turned his patrol car around and initiated a stop of the U-Haul truck for the traffic violation.

---

[1] The video clock indicated 9:27 a.m., however, Trooper Medrano testified the clock was two (2) hours behind.

CRIM\R&R\BESSOLO.CONSENT:2

Trooper Medrano approached the vehicle at the left front window, advised the driver he was being stopped for speeding and asked to see his driver's license.[2] The driver produced his driver's license identifying him as defendant DALE ANDREW BESSOLO. The trooper testified the driver became somewhat argumentative, noting the speed limit was 70 mph. The trooper acknowledged the speed limit but advised defendant he was traveling 76 mph. In response to the trooper asking the driver where he was headed, defendant responded, "El Piso." Defendant asked the trooper if he wanted to see the rental agreement and, when the trooper responded affirmatively, handed the rental agreement to him. In response to the trooper's questioning, defendant stated he was coming from Chicago and was helping a friend move. Defendant also advised he had broken down in Joliet, Illinois. Trooper Medrano, noting the defendant was repeating each of Medrano's questions before answering, then asked defendant to step outside and to the rear of the truck.

The trooper reviewed the rental agreement which indicated defendant had rented the truck in El Paso on August 9, 2006, four (4) days earlier. According to the trooper, when asked the name of the friend he was moving, defendant paused, looked down, and hesitantly replied, "Danny." The trooper testified defendant further advised "Danny" was in the El Paso area already and he was delivering the load to him there. When the trooper asked where in the Chicago area his friend had lived, defendant could not remember. The trooper testified he believed it was "odd" that "Danny" was not traveling with his possessions or assisting in the move. The trooper then asked defendant what he did for a living and defendant identified his

---

[2] The audio portion of the video tape did not record the transaction between the trooper and defendant. The content of the verbal exchange between the trooper and the defendant is derived from the trooper and defendant's testimony at the suppression hearing.

occupation as a truck driver. The trooper voiced his opinion that "Danny" must be a really good friend for defendant, a truck driver, to miss four (4) days of paid work to help him move. The trooper testified defendant responded that he would be paid for the move but when asked how much he advised only that he "thought" he was going to get paid.

Trooper Medrano then approached the passenger who advised she was defendant's girlfriend and was going to be staying with defendant for a few months. The trooper then asked defendant about the passenger and was told by defendant that he had picked her up in Tulsa and she was going to stay a few days with him in El Paso. The trooper testified he found the discrepancy about the length of stay unusual.

Trooper Medrano then went to his patrol car to run a driver's license and criminal history check on defendant while defendant remained outside the truck in front of the patrol car. The driver's license check came back clear, but the criminal history check revealed defendant had prior arrests for possession of a controlled substance and a hypodermic device. The trooper testified that he had "a real suspicion . . . that there was some kind of criminal activity taking place" and made the decision that he wanted to search the vehicle. Consequently, he requested a canine unit but, when told one was not available, requested a second officer's assistance. The trooper completed the warning citation and printed it out.[3] After printing the ticket, Trooper Medrano returned to defendant, advised him he would only be receiving a warning ticket for the speeding violation, and presented the citation to defendant for his signature.[4] The trooper

---

[3] The warning citation printed at 11:38 a.m., however, the computer used to print the citation was not synchronized with the video equipment.

[4] On the video, at 9:38:38, defendant gets up from the truck bumper where he had been seated and appears to be talking to someone on the right side of the truck. Defendant was clearly visible on the video prior to that time and had not been approached with any paperwork.

testified he then returned defendant's driver's license to him and requested he sign the warning citation. Tr. 19, 21, 23, 55, 57. On cross-examination, the trooper acknowledged he did not include information in his report about the return of defendant's driver's license and that he was standing out of the view of the camera so that any return of the license was not captured on video. He also acknowledged he knew the audio was not working on the video tape at the time.

Defendant BESSOLO testified at the hearing and stated Trooper Medrano never returned his license to him at the scene, nor was his license ever returned to him at the DPS headquarters. The trooper did not recall having taken possession of the rental contract from defendant but opined that if he did have possession of the contract, he would have given the rental agreement back to defendant at the same time he returned his license and asked him to sign the citation.[5] Tr. 23, 49, 56-57, 61-62. Trooper Medrano testified that after defendant signed the warning,[6] he asked defendant for consent to search the vehicle. At the hearing, defendant BESSOLO testified the trooper never asked for his consent, rather, the trooper told him his vehicle was going to be searched. Trooper Medrano, however, testified he clearly requested consent from defendant and that when defendant asked why the trooper wanted to search the truck, Trooper Medrano responded that defendant had a criminal history for drugs and drug paraphernalia and wanted to search the truck for illegal items that might be inside the vehicle. The trooper testified defendant then told him he could search the vehicle. When asked if he had any weapons on him, defendant handed the trooper a small pocket knife. At 11:42 a.m., defendant unlocked the lock on the back of the truck and opened the door revealing old couches, an old dryer and refrigerator, and some

---

[5] Trooper Medrano testified it is not a violation of state traffic laws to operate a rental vehicle on state highways without a copy of the rental agreement.

[6] The trooper testified that after signing the warning citation, defendant was free to leave.

luggage.

At 11:47 a.m., Trooper Medrano began a search of the truck. During the search, the trooper found a small black backpack containing large bundles of cash. At 11:59, defendant was arrested and handcuffed by the Trooper Spicer, the trooper who came to assist Trooper Medrano. Defendant was subsequently taken to the DPS office in Amarillo and interviewed by Sergeant Bobby Tyler, a narcotics investigator with the DPS, and Immigration and Customs Enforcement Agent Jimmy Perez after being advised of his *Miranda* rights. During the interrogation, defendant's driver's license and other documents were contained in a folder or package, after which Officer Perez took possession of defendant's driver's license. The money in the backpack was counted, totaling $223,890.00.

II.
PROLONGED DETENTION

A detention may last no longer than required to effect the purpose of the stop. *See United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir.2005) (quoting *Brigham*, 382 F.3d at 507). If all computer checks come back clean, then as a general matter reasonable suspicion disappears, and there is no legitimate reason for extending the stop. *See id*. at 431. "A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Id*.

Defendant appears to argue the purpose of the traffic stop had concluded upon the signing of the warning citation and any detention beyond this point was illegal. Defendant maintains the trooper intentionally detained defendant "after all tasks incident to the traffic stop had been

completed, waiting for a second trooper to arrive at the location of the stop." Defendant concludes that as the continued detention of defendant exceeded the scope of the traffic stop, the resulting search was unconstitutional.

The evidence before the Court, however, reflects the computer checks came back just before 11:38 a.m. The trooper then completed and printed the warning citation at 11:38 a.m., exited the patrol car, and called defendant over to sign the citation. The trooper, also, testified he simultaneously returned defendant's driver's license to him and asked for consent to search the vehicle at the time he obtained defendant's signature on the warning citation (Tr. 21). The Court finds the stop was not unlawfully extended up to defendant's alleged giving of consent. Once the consent was given, any detention thereafter was justified by the consent and allowed the trooper to conduct the search unless and until consent was withdrawn.

### III.
### CONSENT

The testimony concerning whether Trooper Medrano asked defendant for his consent to search the truck and whether defendant consented is in direct conflict. Consequently, the Court must first make a determination as to whether the trooper's testimony that he did ask for consent is more or less credible than defendant's testimony that he was not asked for his consent to search but, rather, was told a search was going to be conducted. The undersigned finds the trooper's testimony to be credible.

The testimony concerning whether defendant's driver's license had been returned to him when defendant was asked for consent to search the vehicle is also in direct conflict. At the hearing, defendant testified he did not feel free to leave because he did not have his driver's license,

having only been given the warning ticket.  Trooper Medrano testified repeatedly, however, that he did, in fact, return the driver's license to defendant with the warning ticket.

The above testimony is critical to this Court's determination of whether defendant's consent was valid.  To determine whether consent was validly given, this Court must ask whether consent was voluntary.  To determine whether consent was voluntary, this Court must consider (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.  *Jones*, 234 F.3d at 242 (citing *Shabazz*, 993 F.2d at 438).  The government bears the burden of proving that consent was voluntary.  *See id*.

1. Custodial status.

Defendant had not been arrested or handcuffed.  Defendant had been told he was only receiving a warning ticket and was asked to sign the warning citation.  While he was not necessarily free to leave until the issuance of the citation was complete, his custodial status was minimal and was certainly no more onerous than the temporary detention any motorist suffers when stopped for an infraction.

2. Coercive police procedures.

There were no coercive police procedures utilized over and above the temporary detention resulting from a normal traffic stop.

3. Defendant's cooperation.

Defendant freely provided information to Trooper Medrano during the encounter. Defendant did employ the tactic of repeating each of the trooper's questions before answering said

questions, but such hesitancy did not result in defendant's non-cooperation.

   4.  <u>Awareness of right to refuse consent</u>.

Defendant testified Trooper Medrano did not ask for his consent to search, rather, he told defendant he was going to conduct a search of the vehicle. Defendant also testified he did not know he could refuse consent, limit consent, or withdraw any consent given. Defendant further testified he did not advise anyone at or about the time of his arrest of his allegation that he did not give his consent to search the vehicle. Trooper Medrano did not utilize a consent form advising defendant of his right to refuse, nor did the trooper verbally advise defendant of his right to refuse consent.

   5.  <u>The defendant's education and intelligence</u>.

There is little information as to defendant's educational level, but there is nothing from the testimony before the Court which indicates defendant's educational or intelligence level is diminished or impaired in any manner.

   6.  <u>The defendant's belief no incriminating evidence will be found</u>.

The monies were inside a back pack in the back of the U-Haul truck. Trooper Medrano had explained to defendant his desire to search the U-Haul was a result of defendant's prior arrest for a drug possession offense, not any money laundering offense. There is no evidence defendant thought the trooper would look inside the back pack or would be looking for any thing other than controlled substances.

Here, the undersigned finds the factors listed above support a finding that defendant's consent was voluntary. The trooper requested consent at the time of the completion of the stop, *i.e.*, when the warning was issued, defendant had at all times been cooperative and seemed to understand and be able to communicate with the trooper, moreover, defendant would most likely have not been

aware that incriminating evidence would have been found in that the trooper had advised the consent to search was being made as a result of defendant's prior arrest history for drug possession, and the monies were concealed in a back pack in the back of the moving truck.

As the consent in this case was provided contemporaneously with the completion of the traffic stop, the consent was not given during any illegal detention. As the consent was not given during an illegal detention, the Court is not required to make any further determination as to whether the consent was an independent act of free will so as to determine if there is a break in the causal chain between a constitutional violation and the consent. *See United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006).

Before closing the discussion of whether defendant BESSOLO's consent was voluntary, the Court must also address the question of whether the rental agreement was or was not returned to defendant. First, it is not clear what happened with respect to the rental agreement. The trooper does not remember and defendant's testimony that it was not returned to him is not credible for several reasons, including the fact that he was directly contradicted by Trooper Medrano on the critical question of whether consent was requested. It is clear, however, that the government has not shown, by a preponderance of the evidence, that the agreement was returned. The question thus presented is whether defendant's consent is valid if the rental agreement was not returned. The undersigned finds the consent was still valid.

First, defendant testified he did not feel free to leave because his driver's license had not been returned. He did not testify that the failure of the trooper to return the rental agreement affected his decision. Secondly, the exchange between the signing of the warning ticket and the requesting of consent was during or simultaneous to the end of the traffic stop. As there was no

extended detention, the Court does not need to determine whether any post-traffic (*Terry*) stop was consensual <u>and</u> whether the retention of the rental agreement rendered what would have been a consensual encounter to be non-consensual. Third, considering the totality of the circumstances, as this Court must, any retention of the rental agreement did not render an otherwise valid consent invalid.

      Having found defendant's consent was contemporaneous with the conclusion of the traffic stop, the undersigned finds no unconstitutional prolonged detention occurred in this case.

      The Court recognizes, in making this finding, that without the audio portion of the tape of the traffic stop, it is not possible to determine with precision the exact point in time when the warning ticket was issued and when the consent to search was requested. The trooper's testimony, however, establishes that the exchange was simultaneous or, at the most, within one to two seconds of each other.

      Further, a factual scenario very similar to the present case was previously presented to this Court in *United States v. Torres*, 2:03-CR-0122, Amarillo Division, Northern District of Texas. In that case, the undersigned, following the cases of *United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999), *United States v. Jones*, 234 F.3d 234 (5th Cir. 2000), and *United States v. Santiago*, 310 F.3d 336 (5th Cir. 2002), determined those cases applied a bright line and supported a determination that any detention following the end of the computer check and delivery of the warning ticket to the motorist would be an illegal detention. In making this finding, however, the undersigned also noted the Fifth Circuit cases of *Dortch, Jones*, and *Santiago* appeared to be somewhat inconsistent with the Supreme Court's decision in *Ohio v. Robinette*, 519 U.S. 33 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), in which the Supreme Court specifically determined that an officer was not required to

notify defendant when a traffic stop had concluded and that he was free to go before requesting consent. Further, the Supreme Court rejected any *per se* or bright line test and, instead, utilized a totality of the circumstances analysis. In *United States v. Torres*, the undersigned found the consent was given some eighteen seconds after the completion of a traffic stop and was, therefore, the product of an illegal detention and not valid. That finding, however, was not adopted by the district judge. In denying the motion to suppress, the district judge found the warning ticket was issued simultaneously with the giving of consent or at the maximum, one second thereafter. Further, the denial of the motion to suppress was upheld on direct appeal. The facts of this case are as persuasive, if not more so, than were the facts in *United States v. Torres* that consent given was simultaneous with the termination of the traffic stop..

This Court, however, decided *United States v. Torres* prior to the cases of *United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004) (*en hanc*), and *United States v. Jenson*, 462 F.3d 399 (5th Cir. 2006). The defense argued at the close of the hearing in this case that any detention, however brief, after the completion of the computer check constitutes an illegal detention pursuant to *United States v. Jenson*. The holding in *Jenson* supports defendant, but such holding also appears to conflict with the Fifth Circuit holding in *United States v. Brigham*. *Brigham* specifically held that the reasonableness inquiry into the legality of a *Terry* stop must be based upon the totality of the circumstances instead of making or emphasizing a fact specific inquiry. Further, *Brigham* holds there is no constitutional stopwatch involved in traffic stops and the relevant question is whether the police diligently pursued their investigation. The *Jenson* court acknowledged the holding in *United States v. Brigham*, but further stated that *Brigham* did not overrule the Fifth Circuit's prior cases of *United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999), *United States v. Jones*, 234 F.3d 234 (5th

Cir. 2000), and *United States v. Santiago*, 310 F.3d 336 (5th Cir. 2002).  *Jenson,* 462 F.3d at 408, n. 14.  Consequently, if the Court, on review, determines the consent in this case was not simultaneous, then the significance of *United States v. Jenson* is critical.

## IV.
## RECOMMENDATION

It is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that the motion to suppress filed by defendant DALE ANDREW BESSOLO be DENIED.

## V.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 22nd day of December 2006.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

## * NOTICE OF RIGHT TO OBJECT *

Any party may object to these proposed findings, conclusions and recommendation.  In the event a party wishes to object, they are hereby NOTIFIED that the deadline for filing objections is eleven (11) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(B), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(D).  When service is made by mail or electronic means,

three (3) days are added after the prescribed period. Fed. R. Civ. P. 6(e). Therefore, any objections must be <u>filed</u> **on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b); R. 4(a)(1) of Miscellaneous Order No. 6, as authorized by Local Rule 3.1, Local Rules of the United States District Courts for the Northern District of Texas.

      Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).